The general court reversed the judgment of the county court, and the petitioner appealed to the court of appeals.

*186
In the Court of Appeals.

Shaajf, for the appellant.
This cause coming up on an appeal from the decision of the inferior tribunal, upon matter of law and of fact, the consideration of both those subjects is now properly before the court, which is finally to decide from the record, whether the court below has erred in its judgment of either.
The facts in the case, about which as yet there has been no controversy, may be drawn into a very narrow compass, and, on examination, will be found to be as follows:
That the present appellee, since the disturbances in the French islands, came from Saint Domingo, on or about September, 1791, and brought the appellant with him, stated to have been the slave of the appellee in the island, and never in the United States before. That in September, 1791, he came to Frederick county, Maryland, and brought the appellant with him. That the appellant resided in Frederick Town and county in September, 1791, and still resides there with the appellant in his family and service. That in September, 1792, the appellee became a naturalized citizen of the United States.
Upon this statement of facts, a judgment was given in Frederick county court, for the present appellant, which was afterwards reversed in the general court.
The just determination of the right to freedom set up in this case, will most properly be made by considering the object the legislature had in view, at the time of the passing of the original law upon the subject, in the year 1783, and the particular inconvenience which Was to be remedied, it being a sound and sensible rule of construction in expounding laws, to give such a meaning to the expressions as will, consistently with the words, most effectually advance the remedy, and prevent the inconvenience contemplated.
*187 The clear and manifest intention of the general assembly was, to prevent the introduction of slaves into this state, except by citizens of the United States, who came to reside here ; in this, following the example of Pennsylvania and other states, who before, and about the same period, passed similar laws on the same subject. The great inconvenience was, the introduction of slaves into this state, and in that point of view, it was certainly the same thing whether the slave was originally brought here to reside, or, being first brought here for a different purpose, his master afterwards took up his residence in this state with the slave.
The first law upon this subject is the act of April session, 1783, c. 23. which enacts, that it shall not be lawful to bring in, or import, by land or water, any slave for sale, or to reside within this state; and any slave brought in contrary to that law, is declared to be immediately free, with a proviso in favour of citizens of the United States coming here to reside, to bring their slaves who were inhabitants of some one of the United States for two years next before the importation; likewise a proviso in favour of travellers and sojourners for a short time.
Under this act of assembly, nothing can be more plain, by the only sensible and rational construction of it, than that if any person, not a citizen of any of the United States, brought a slave into this state, who had never been an inhabitant of any of the states, and actually resided in this state with the slave in his service, the slave, by this transaction, became entitled to his freedom, although the master did not originally bring the slave to reside here; the only question for inquiry, in my judgment being, did the master in that case become a resident, or did he not, and not what his original intentions were.
To give the law a different construction, would be productive of the greatest absurdity, which will clearly be *188 discovered by pursuing it through its consequences. The avowed object of the law is to prevent the introduction ^ ^ore'Sn slaves by foreigners; and the stranger’s actually residing in this state with his slaves, was the thing particularly designed to be prevented; but if I am not accurate in my construction of the law, and it should be contended that to bring the case within the act, it is also necessary that the slave should originally have been brought here for the purpose of residence, this absurdity will follow, that a foreigner may bring his slaves into this state, and continually reside here with them, if he did not originally come here with an intention to reside j. a circumstance in which no person is interested, and rests solely in the party’s own knowledge, and thus the great scope and object of the law is defeated by superadding a requisite which is in no way connected with the inconvenience intended to be remedied-
The construction which I give to the act of assembly, is clearly warranted by the obvious import of the second section, which declares that the .law shall not set free any slave brought into the state by a person travelling through the state, or sojourning therein for a short time, such slave not being sold in the state, but carried out by the owner. This part of the act decidedly proves that a person who did not originally come into the state to reside, but only to sojourn, is not entitled to keep his slaves here for a length of time, and of course excludes the propriety of his residing in the state with them.
Taking it, therefore, for a concessum, that the exposition which I have given to the law is the only legal one, I will proceed to consider the case now before the court, and, it being an appeal from the law and the fact, it will be necessary to examine the evidence.
The facts in this case are before stated, that the appellee, being a foreigner, came to Frederick county with the appellant, and resided there, in September, 1791; that he resided there with the negro, at the time of the taking *189 .of the deposition in the cause, and that he was natural!zed in September, 1792, and the petition was filed in February, 1793.
_ This court can only decide from the record and the evidence there stated, and can take notice of nothing which does not there make its appearance; from this record there is the strongest evidence that the appellee originally came to Maryland with an intention to reside there. It must be obvious to the court, that the intention with which any act is done is wholly within the mind of the agent himself, and can be discovered by-third persons in no other manner than by the action itself. This is too self-evident a truth to require an argument to support it. The only facts in this cause which are proved are, the time when the appellee came to Maryland, his continuance there, his naturalization and his actual' residence. The intention with which he came is not positively proved ; but the facts established, and the residence which did take place, is almost conclusive evidence of the original intention to reside, and the only evidence that the nature of the case will admit of. If I am accurate in these deductions from the evidence, one objection is obviated.
But I cannot think it necessary to inquire what was his original intention, if it can be established that the appellee did in reality come to, and reside, in this state with the slave ; this is to be established by the record.
Residence, like all other facts, is to be made out in evidence, and in this case it is most positively proved, as the only deposition in the cause expressly states, that the appellee resided in Frederick Town; this, then, being established by the only proof in the cause, it cannot be contradicted, and the court must intend, from this record, that the appellee became a resident in Frederick Town in September, 1791, with the appellant with him. But independent of this positive proof of residence, the other facts in the cause will unquestionably establish it, *190 since it is stated that the appellee came from a foreign country to Maryland in September, 1791, continued there until he was naturalized in September, 1792, and remained there when the petition was filed in February, 1793 ; all which most clearly proves a residence, if any species of testimony can do so.
The single fact of the appellee’s having become naturalized, is sufficient to convince any mind of his residence in this state, if the act of congress, under which that took place, is considered for a moment. The act of congress, 1790, c. 3. permits an alien who has resided two years in the United States, to become a citizen, on proof of that fact; It is proved here that the appellee continued in this state from September, 1791, to Sepber, 1792, when he became naturalized ; of course, that space of time must be taken to be part of the two years, to entitle him, under that law, to become a citizen of the United States.
It will here, no doubt, as on a former occasion, be urged that the second section of the act of 1783 will protect the present case, as that section declares that the law will not give freedom to a slave belonging to any man travelling through, or sojourning in the state for a short time, the slave being carried out of the state by the owner; and the appellee will be represented as having been driven from St. Domingo by the enemies of that country, and as flying to this state for protection, and that he will come under the description of a person sojourning here for a short time, which will be construed as a relative expression, and taken to mean a different time, as applicable to a different subject. If this was the case of the present party, it would be a very hard one, and well merited the interposition of the legislature, and in reality, such cases were taken up by the session of 1792, and provision made for those cases which came within the purview of the law of that year, among which number it is contended that the present is not one.
But however forcibly this argument of hardship may *191 be addressed to the benevolence and humanity of mankind, yet it can certainly have no reference to the case under the consideration of the court. In the first place it is not in reality true, nor are any facts stated in this record from which the court can in any manner infer, that the appellee was driven from St. Domingo by the enemy, and sought an asylum in this state from the enormities practised in that island; and if no facts are spread upon the proceedings in this case, the court cannot now judicially take notice of any thing but what appears on the record itself. The record only states that the appellee came from the island after.the disturbances there, which may well have happened, as was the truth, in the infancy of the tumults in that country, and before it was necessary, from motives of safety, to leave it; and although the members of the court individually may be acquainted with the calamities which happened to the unfortunate men of that island; yet, if the present party was included in the number, it was a thing capable of proof, and not being established by evidence, this court cannot judicially take notice of it, or any other extrinsic matter, but must confine their attention to the record, and from it alone must their opinion be formed. The 2d section is also a proviso for the benefit of the master, and it is a clearly established principle of law, that any one who would take advantage of a proviso for his benefit, must bring himself within it.
It here must be further observed, that this second section, by the very terms and meaning of it, only applies to those who sojourn in this state for a short time. Now it must certainly be conceded that residing and sojourning are terms of very different import, and so construed and considered in the construction of laws; the former always meaning the dwelling at the home of the party, the latter constantly signifying the party’s dwelling from his home; and it frequently happens that a person resides at one place, and sojourns at another. The proviso *192 in 'this section only takes in the case of those who so-journ ^ this state, and of course must mean something contradistinguished from a residence; and as the evidence expressly proves that the appellee resided in Frederick Town, it excludes the idea of his having simply sojourned there, and clearly proves him. not to come within the proviso.
It is very questionable whether the appellant would not have been entitled to his freedom, even if his master had not become a resident of this state, because the act only protects those who sojourn for a short time, and this slave is proved to have continued from September, 1791, until February, 1793, which is 17 months, and it can never be urged that those who are driven into this state with their slaves may continue here with them until the necessity which brought them here ceased, since the necessity might continue for ever, and thereby the law would be defeated. The legislature seems to have entertained the same idea, by enacting the law of 1792, and by it have taken in the case of particular persons who fled into this state, and have noticed them when their cases have come within that particular act.
We have so far considered this case under the act of 1783, under which it is presumed that the appellant is entitled to a judgment in his favour. The next subject of inquiry is the act of 1792, c. 56. and it must be first observed, that it passed on the 23d day of December, 1792, a period subsequent to the naturalization of the appellee, which was in September, 1792.
By this law it is declared, that all slaves imported by, and the property of, French subjects, &c. shall remain the property of their masters, &c. But the third section contains a proviso that this law shall not affect any right, which any slave, &c. may have acquired under the existing laws of this state. Which last proviso would certainly have been implied, as no law can have a retrospective effect to injure the right of any individual in society.
*193 St will then become necessary to examine when the right to freedom accrued, and, of course, again to consider the act of 1783, under which law the petitioner makes his claim to freedom.
The right to freedom under this law can certainly not accrue upon a judgment for freedom, or on the commencement of a suit for it, because both presuppose an existing right. A petition for freedom being, like all other suits in a court of justice, an application to get the benefit of a right which the party was entitled to before, but which was denied him. When, then, did the right accrue ? A very slight observation of the law will establish that fact.
The act declares it unlawful to import or to bring to this state, by land or water, any slave to reside, or for sale; and if any slave shall be brought in contrary to the act, he shall thereupon immediately be free. If the appellant was originally brought into this state to reside, the act declares him immediately thereupon to be free, which must mean immediately upon his importation. And I think the evidence on record in this cause is strong to prove that the appellant was originally brought here for purposes of residence. But if it should be thought there is no evidence of the first intention, yet it is clearly proved that the appellant did reside in this state in September, 1791, with the slave. From what has been before observed, I think there can be no doubt but that, if the residence of the appellee in this state is proved, it will support the case of the negro, whatever might have been the first intention; and if that position is once either admitted or proved, there can be no doubt but that, whenever the residence of the master is complete, in such a case the right to freedom in the slave accrues.
But a very important fact is the naturalization of the appellee, in September, 1792, before the passage of the last law. How, then, can it be doubted but that, after the appellee had resided with his slave one year, and became a citizen of America, the right to freedom had accrued *194 to the appellant, under the act of 1783, if it is possible that any slave can acquire a right to freedom under that laW ?
I therefore conclude, that the appellant’s right to freedom was complete in September, 1791; but if that should be doubted, it certainly was perfected in September, 1792, when the appellee was naturalized j and if that be established, the present ease cannot be affected by the act of 1792, which passed on the 23d day of December, 1792, subsequent to the accruing of the appellant’s right, and all rights antecedent to its passage are protected.
I only further observe that the act of 1792 was only designed for the benefit of French subjects, and not intended to take in the case of an American citizen; that the appellee was, before the passage of the law, a citizen of the United States, and his having before been a French or a British subject is perfectly immaterial as to the present purpose.
It will here be objected that the act of 1792 has an express relation to those slaves which were in Maryland before its passage, declaring those imported, or to be imported., to remain slaves, &c. But without recurring to the proviso, or mentioning the absurdity of giving the law a retrospective effect, the act can easily be so expounded as to give it a rational meaning, and at the same time gratify the words of the law, by construing the word imported so as to make it relate to such slaves as had been brought in and had not acquired any right to freedom, which well might be, as in the case of a slave recently imported by his master, who had not become a resident or citizen, in which case he would be considered as a sojourner under the act of 1783, and the slave not entitled to freedom. The last act, then, being enacted before the accruing of any .right in such negroes, the master would be entitled to keep him, and the claim of no one would be injured; but in the present appeal the master had both become a resident and citizen before the law passed.
*195 These are my reflections on the operation of the two acts of the general assembly on this case 5 and although the present decision is of the utmost importance to the appellant, where right to freedom is now to be finally determined by this court; yet it is apprehended it can have but little effect on the general question respecting the claims to freedom by the negroes of the French emigrants, because, in all probability there is not another case in which similar facts exist, and of course, there would not be a similitude of determination.
Cooke, for the appellee.
Ploxoden compares a law to a nut which has a shell and kernel. If you stick to the shell, which is the words, you will never get the kernel, which is the spirit of the law.
There are two ways of construing laws.
1st. Laws may be construed so as to take a case out of the letter, when it is within the letter, and not within the meaning of the law.
2d. Or so construed as to bring a case within the meaning, though it is not within the letter.
Now the words of the act of 1792, c. 56. in section 4, are, “ If they (the French) become citizens or settlers in the state, they shall be entitled to keep,” &c. Though, in grammatical construction, it would mean, shall become citizens, &C. yet, certainly the same reason applies to those who had become citizens, and therefore the act ought to be construed if they had or do become citizens or settlers.
The law of 1792 had a further operation. It was intended to restrain the number of negroes that might be held, and to compel the- owner, if he continued to sojourn among us, to export all above a certain number.
It never could have been the intention of the law to distinguish between those who had become citizens, and those who should thereafter become citizens ; nor to distinguish between the rights of the negroes in the one *196 case an(j jn the other. The law meant to encourage these people to become citizens.
By the treaty between France and America, the property of the citizens of each nation are preserved to them, and each may hold property in the dominions of the other, in the same manner as if they were in their own country. De Kerlegand, as a French subject, might hold this property, if not brought here for the purpose of sale. How absurd it is to say, therefore, the moment he becomes a citizen of this state, he loses that privilege.
Was it as an American, or as a French subject, that he acquired the property in his slaves ? Has he contravened any law of this state in acquiring that property ? If he had acquired it since he became a citizen of the United States, he ought to lose it; but holding it legally as a Frenchman, it would be strange that he should lose it on becoming a citizen.
The spirit of the law is in favour of De Kerlegand.
1. Because, though he is naturalized, it must be admitted he is one of the number of unhappy people who have been obliged to abandon their fortune because of the troubles in the French colonies, specified by the law.
2. Because the legislature have not said that those who have been naturalized before the passing of the law, cannot participate of its benefits; but on the contrary, have said that all these people, naturalized or not naturalized, should preserve their slaves.
If the legislature had intended to exclude these people, they would have given effect to the law only from the time of the enacting of it; but instead of that they took a retrospective view, and carried their humanity back to the commencement of the troubles in the colonies, from the derangement in their government, up to the period when peace, order and tranquillity should be restored to the islands. Such is the language and spirit of the law.
When it appears by the general expressions of the law, that the legislature intended to give aid to all, can *197 we make exceptions ? If the legislature gives protection to those not naturalized, who came into this country before the law, and who have no merit but their misfortunes, can we reject this man because he has become a citizen ? Does the naturalization of this man change his nature ? Does it restore his losses ? Does it cease to make him an unfortunate Frenchman P If it does, then I admit he is within the law which seeks out these unhappy people in order to protect them, and which declares that law and justice and hospitality requires that men reduced to the necessity of asking an asylum for themselves and their property, ought not to be refused it.
At June term, 1796, the court of appeals affirmed the judgment of the general court.